IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
On Brief February 28, 2005

## JUDY DODSON. v. ST. THOMAS HOSPITAL, ET AL.

**A Direct Appeal from the Circuit Court for Davidson County**
**No. 03C-1563     The Honorable Barbara Haynes, Judge**

_____

**No. M2004-01102-COA-R3-CV - Filed April 7, 2005**

_____

Appellant, an at-will employee, was terminated from her position with St. Thomas Hospital because an investigation led Hospital employees to the conclusion that Appellant was involved in the harassing and stalking of another employee. Appellant sued Hospital and two employees for intentional infliction of emotional distress and negligent infliction of emotional distress stemming from her termination. Appellees moved for summary judgment, which was granted. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

James L. Harris of Nashville For Appellant, Judy Dodson

Matthew C. Lonergan and Karyn C. Bryant of Nashville For Appellees, St. Thomas Hospital, Kathy Tyler, and Diane Fitzpatrick

**OPINION**

Judy Dodson ("Plaintiff," or "Appellant") was formerly employed by St. Thomas Hospital (the "Hospital") as a Cardiac Thoracic Operating Room Processing Assistant. Specifically, Ms. Dodson was responsible for stocking the sub-sterile areas, counting instruments, stocking back-up carts and setting up the operating rooms for the nurses. Ms. Dodson's work hours were from 5:30 a.m. until 2:00 p.m.

In late February 2003, Jan Barnhill, a registered Nurse in the cardiac surgery area, began receiving threatening and harassing cards and letters at the Hospital. The initial cards and letters were found taped to Ms. Barnhill's locker in the cardiac surgery room. Ms. Barnhill reported the cards and letters to Brian Baker, the Hospital's Security Supervisor, and Mr. Baker began an investigation.

At the outset of the investigation, Mr. Baker interviewed Ms. Barnhill and other cardiac surgery employees about the cards and letters. Ms. Barnhill believed that it was possible that her ex-boyfriend was in some way connected to the threats; however, her ex-boyfriend was not a Hospital employee and would allegedly not have been able to access the locker room. None of the employees that Mr. Baker interviewed had seen anyone deliver the cards and letters nor did they have any idea who might be responsible. In addition, none of the employees were able to provide any specific information as to when the cards and letters appeared in the locker room.

Additional cards and letters were left on Ms. Barnhill's locker in March 2003 and other cards were mailed to the Hospital's address to the attention of Ms. Barnhill during this time. Because of the inability to pinpoint the timing of the delivery, Mr. Baker was unable to identify the individual(s) responsible for leaving the cards and letters.

On April 10, 2003, additional cards addressed to Ms. Barnhill were found at approximately 6:30 a.m. in the cardiac surgery lounge. Access to the cardiac surgery lounge is restricted to Hospital employees. Mr. Baker interviewed several employees and learned that the cards had not been in the lounge the night before. He then reviewed the videotape recording made by the surveillance camera immediately outside the door leading to the cardiac surgery area where the lounge is located. The tape showed several people, including Ms. Dodson, entering the area. Each of the individuals who entered the area, other than Ms. Dodson, wore surgical scrubs. Thus, Mr. Baker determined that those individuals were entering the area for a legitimate purpose. Ms. Dodson, however, entered the area in street clothes carrying a purse. She exited quickly–within approximately one minute of entering. From this, Mr. Baker determined that Ms. Dodson was entering the area for the purpose of dropping something off and not for the purpose of working.

Following Mr. Baker's review of the tape, he contacted Diana Fitzpatrick, the Cardiac Thoracic Operating Room Manager for the Hospital and the supervisor for Ms. Barnhill and Ms. Dodson. Ms. Fitzpatrick identified Ms. Dodson on the tape. Ms. Fitzpatrick and Mr. Baker then met with Ms. Barnhill to determine if she had any type of relationship with Ms. Dodson or if there was any reason that Ms. Dodson would be involved in delivering the cards and letters. During the interview, Ms. Barnhill informed Ms. Fitzpatrick and Mr. Baker that Ms. Dodson had cleaned her house for a period of time but that she had advised Ms. Dodson several months prior that she no longer needed her services. Ms. Barnhill also indicated that Ms. Barnhill's former boyfriend had frequently been present at her house when Ms. Dodson was cleaning and that he appeared to have developed a friendly relationship with Ms. Dodson's husband who was also present during the cleaning.

On April 17, 2003, three cards were found on the cardiac surgery desk. Mr. Barker reviewed the videotape recording made of the surgery desk area. The tape showed Ms. Dodson removing three cards from her purse and laying them on the desk.

On April 22, 2003, Ms. Fitzpatrick and the Hospital's Human Resources Generalist Cathy Tyler (together with Ms. Fitzpatrick and the Hospital, "Defendants," or "Appellees") met with Ms.

Dodson. Ms. Fitzpatrick and Ms. Tyler informed Ms. Dodson that the Security Department had been investigating the harassing letters and cards and that they had a videotape that showed Ms. Dodson delivering three of the letters. When asked why she delivered the cards, Ms. Dodson allegedly replied that the cards and letters were "a joke," that she did not write them and that she had delivered them "for a friend." Ms. Dodson allegedly refused to divulge the name of said "friend." Ms. Fitzpatrick and Ms. Tyler then informed Ms. Dodson that the letters were of a threatening nature and inappropriate and that the Hospital was terminating her employment. Ms. Dodson allegedly said that she could not understand why the Hospital was terminating her employment and repeated that it was "just a joke." Ms. Tyler and Ms. Fitzpatrick explained that her actions were a form of stalking and that she had violated the Hospital's employment policies.

Following her termination, on May 27, 2003, Ms. Dodson filed a Complaint against the Hospital, Ms. Tyler and Ms. Fitzpatrick. The Complaint reads, in relevant part, as follows:

> 6. Plaintiff was attending to her job functions at approximately 5:15 AM on April 17, 2003. A man not familiar to her approached her, stating that he was lost and needed to deliver some "Thank You" cards to the Department of Open Heart Surgery. He had several sealed envelopes in his possession, which he represented contained the cards. Plaintiff advised this person that the Department was not open, and this person thereupon asked plaintiff if she would be willing to assist him in getting the cards to their intended destination. Plaintiff, in accordance with St. Thomas' established protocol and "Core Values," replied that the envelopes could either be left with St. Thomas Security or, alternatively, he could leave the envelopes with plaintiff and she would place them on the desk in the Department requested. The person asked plaintiff to deliver the cards. She agreed to do so, and did in fact deliver the envelopes, unopened, to the destination requested.

> 7. Plaintiff had no reason to believe that the person described hereinabove had any motive other than that stated, nor any reason to believe that the sealed envelopes contained anything other than "Thank You" cards, as represented. Plaintiff did, in fact, reasonably believe that the representations made to her by the person in question were true.

> 8. On April 22, 2003, plaintiff was summoned summarily and without warning to the St. Thomas Human Resources Department. At that time, defendants Tyler and Fitzpatrick, acting in their respective capacities as employees, servants, and disclosed agents of St. Thomas, informed plaintiff that she was being discharged from her employ for "stalking." Plaintiff was informed that the sealed

envelopes which she had received and delivered, as described hereinabove, contained threats against a St. Thomas nurse named Janice Barnhill. Defendants called plaintiff a criminal. St. Thomas caused a criminal complaint to be made against plaintiff with the Metropolitan Nashville Police Department, as a result of which plaintiff was threatened with being charged with unspecified crimes apparently associated with the contents of the sealed envelopes.

9. Defendants knew, or in the exercise of reasonable prudence and diligence should have known, from plaintiff's long and untroubled employment history that it was extremely unlikely that plaintiff would surreptitiously threaten a fellow employee or act in any other way commensurate with an accusation of "stalking." Defendants' investigation of the incident described in this Complaint was either nonexistent or woefully inadequate and negligently performed.

10. The conduct of defendants, as described hereinabove, was "outrageous conduct" both tortuous and actionable.

11. The conduct of defendants, as described hereinabove, is correctly characterized as intentional infliction of emotional distress. Alternatively, the conduct of defendants, as described hereinabove, is correctly characterized as negligent infliction of emotional distress. Either or both are actionable.

12. The conduct of defendants, as described hereinabove, was defamatory and actionable.

13. As a direct and proximate result of defendants' wrongful acts and omissions, as described hereinabove, plaintiff has suffered and will continue to suffer psychological injury, extreme emotional distress, and humiliation. Further, plaintiff's earning capacity has been diminished by said conduct.

**WHEREFORE AND FOR ALL OF WHICH** plaintiff sues defendants, jointly and severally, for $1,000,000.00 in actual damages and $1,000,000.00 in exemplary damages....

On July 9, 2003, the Appellees filed an Answer generally denying the accusations contained in Ms. Dodson's Complaint and asserting, *inter alia*, that Ms. Dodson was an at-will employee who was subject to termination at any time.

On February 27, 2004, Appellees filed "Defendant's Motion for Summary Judgment," along with a Statement of Material and Undisputed Facts, depositions, affidavits, and other documentation in support thereof. On April 12, 2004, Ms. Dodson filed "Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment," along with "Plaintiff's Response to Defendant's Statement of Material and Undisputed Facts."

A hearing was held by the trial court on April 16, 2004. On April 27, 2004, the trial court entered its Order granting Appellees' Motion for Summary Judgment. Ms. Dodson appeals and raises two issues for review as stated in her brief:

> 1. Whether the Court erred in holding that Tennessee law does not recognize causes of action for negligent or intentional infliction of emotional distress in the context of an employer's termination of an at-will employee.

> 2. Whether the trial court erred in holding that Defendant was not liable for the tort of negligent infliction of emotional distress.

In addition to the above issues, Appellees assert that Ms. Dodson's appeal is frivolous and that, consequently, they are entitled to an award of fees and expenses.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth specific facts showing that there is a genuine issue of material fact for trial.

*Id.* at 210-11 (citations omitted).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding

a trial court's grant of summary judgment. ***See Bain***, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is ***de novo*** on the record before this Court. ***See Warren v. Estate of Kirk***, 954 S.W.2d 722, 723 (Tenn.1997).

Ms. Dodson first contends that summary judgment was granted in error because the record contains disputed material facts. Specifically, Ms. Dodson asserts that the outcome here "hinges squarely on state of mind, intent, or witness credibility" and, consequently, summary judgment is not the appropriate vehicle for disposition. As set out in her Complaint above, Ms. Dodson claims that she was approached by a stranger who asked her assistance in delivering some "Thank you" cards. However, aside from the Complaint, there is nothing in this record (i.e. a sworn statement) to corroborate her account of the events that precipitated her placing the envelopes on the department desk.[1] When reviewing the lower court's decision, we must bear in mind that the causes of action at issue in this appeal are negligent infliction of emotional distress and intentional infliction of emotional distress. The material facts bearing on these causes of action, therefore, lie in the actions of Ms. Tyler and/or Ms. Fitzpatrick in dealing with Ms. Dodson during the meeting that culminated in Ms. Dodson's termination. As evidenced by Ms. Dodson's "Responses to Defendant's Statement of Material and Undisputed Facts," the actions of Ms. Tyler and Ms. Fitzpatrick are undisputed, to wit:

19. On April 22, 2003, Ms. Fitzpatrick and Cathy Tyler, Human Resources Generalist, met with Ms. Dodson after reviewing the Security Department's investigation.

**RESPONSE: Admitted.**

20. Ms. Fitzpatrick and Ms. Tyler advised Ms. Dodson that the Security Department had been investigating the delivery of threatening and harassing cards and letters to Jan Barnhill and they had learned that she had been involved in delivering the cards and letters.

**RESPONSE: Admitted.**

21. Ms. Fitzpatrick and Ms. Tyler explained to Ms. Dodson that they had reviewed video tape recordings which showed her entering the hall leading to the cardiac lounge at the approximate time cards were left in the lounge and leaving a set of cards at the security desk.

**RESPONSE: Admitted.**

---

[1] We note that Ms. Dodson's Deposition was filed in this case; however, this Deposition does not contain testimony concerning a stranger allegedly soliciting Ms. Dodson to deliver the envelopes.

22. Ms. Tyler asked Ms. Dodson why she had delivered the cards and letters to Ms. Barnhill and Ms. Dodson replied that the cards and letters were "a joke," that she did not write the cards and letters and that she had delivered them "for a friend." Ms. Tyler and Ms. Fitzpatrick asked Ms. Dodson what friend and she said "just a friend."

**RESPONSE: Admitted, but incomplete. Plaintiff's use of the word "joke", in context, was meant in the sense that the current circumstances–being terminated–were preposterous and unfair. The "friend" plaintiff referred to was a friend of someone else, not a friend of plaintiff.**

23. Ms. Tyler and Ms. Fitzpatrick then told Ms. Dodson that the letters were of a threatening nature and inappropriate and the Hospital was terminating her employment.

**RESPONSE: Admitted.**

24. Ms. Dodson said she could not understand why the Hospital was terminating her employment and repeated that it was "just a joke." Ms. Tyler and Ms. Fitzpatrick explained that her actions were a form of stalking and that she had violated the Hospital's employment policies.

**RESPONSE: Admitted, but incomplete. See Response to no. 22, above.**

(Citations to the record omitted).

Ms. Dodson also contends that the Hospital was negligent in its investigation surrounding the harassing letters and cards. When questioned about her knowledge of the extent and nature of Mr. Baker's investigation, Ms. Dodson responded, in relevant part, as follows in her Deposition:

Q. You claim in the lawsuit you filed against the defendants, Mrs. Dodson, as I understand it, that the defendants' investigation of the matters surrounding your termination was nonexistent, inadequate, or negligent. Tell me what you know about what investigation was performed prior to your termination.

A. They [ Ms. Tyler and Ms. Fitzpatrick] said they seen [sic] me laying the cards on the desk and that I was on camera, which I didn't deny doing. I told them I did it.

      *                         *                     *

Q. Okay. Do you know anything else about what kind of investigation was performed that led to your termination?

A. That's all they told me.

Q. Okay. Tell me then, what is the factual basis for your claim in this lawsuit that the defendants did not do an adequate investigation prior to terminating you?

A. What do you mean?

Q. Do you understand my question?

A. No.

Q. Well, you've claimed in this lawsuit, Mrs. Dodson, that the defendants' investigation into the events that led to your termination was negligent, inadequate, and nonexistent. What I want to know is what facts you relied on for that claim.

A. Well, I would think you would have to have more than that, just the four cards.

Q. More than what?

A. More proof of something, you know, that–because all I did was laid [sic] the four cards on the desk, and they fired me on that. I mean, to me, you would have to have substantial...something that I'm doing wrong other than that.

Despite the fact that Ms. Dodson, in her deposition, contends that she knew nothing of the investigation outside the fact that the Hospital knew she had place the cards on the department desk, in her "Responses to Defendants' Statement of Material and Undisputed Facts," she admits to the following facts surrounding Mr. Baker's investigation:

7. Mr. Baker was unable to pinpoint the approximate time the cards and letter [the initial cards and letters found taped to Ms. Barnhill's locker in the cardiac surgery locker room] had been delivered in order to focus on the specific individuals entering or exiting the locker room at a particular time.

-8-

**RESPONSE: Admitted.**

\*                                    \*                                    \*

10. On April 10, 2003, additional cards addressed to Ms. Barnhill were found at approximately 6:30 a.m. in the cardiac surgery lounge. Access to the cardiac surgery lounge is restricted to Hospital employees.

**RESPONSE: Admitted.**

11. Mr. Baker interviewed employees and learned that the cards had not been in the lounge the night before.

**RESPONSE: Admitted.**

12. Mr. Baker then reviewed the video tape recording made by the camera immediately outside the door leading into the cardiac surgery area where the lounge is locate.

**RESPONSE: Admitted.**

13. The tape recording showed several individuals entering the area before the cards were found, including Ms. Dodson. Each of the individuals who entered the area other than Ms. Dodson wore surgical scrubs and Mr. Baker thus determined that those individuals were entering the area for the purpose of proceeding to operating rooms for surgery or other work in the cardiac surgery area.

**RESPONSE: Admitted.**

14. Unlike the others who entered the cardiac surgery area before the cards were found, Ms. Dodson entered the area in street clothes carrying a purse. She exited the area quickly; leaving within approximately one-minute of entering the area. These facts indicated to Mr. Baker that Ms. Dodson was entering the area not for the purpose of work but for the purpose of dropping something off in the lounge.

**RESPONSE: Admitted.**

15. Following Mr. Baker's review of the tape, he contacted Diana Fitzpatrick, Cardiac Thoracic Operating Room Manager for the

Hospital and the supervisor for Ms. Barnhill and Ms. Dodson, and asked her if she could identify the individual on the tape.

**RESPONSE: Admitted.**

\*                                          \*                                          \*

18. On April 17, 2003, more cards were found on the cardiac surgery desk. Mr. Baker reviewed the video tape recording made of the surgery desk area. The tape showed Ms. Dodson removing three cards from her purse and laying them on the surgery desk.

**RESPONSE: Admitted.**

(Citations to the record omitted).

Based upon the foregoing admissions, it appears that the material facts surrounding Mr. Baker's investigation are undisputed in this case. Having found that there is no dispute of ***material*** fact in this case, we now turn to the question of whether Appellees are entitled to summary judgment as a matter of law.

It is undisputed that Ms. Dodson was an at-will employee of the Hospital. Our Supreme Court, in ***Stein v. Davidson Hotel Company***, 945 S.W.2d 714 (Tenn. 1997), states as follows concerning when a cause of action lies for a legal wrong stemming from termination of an at-will employee:

> The doctrine of employment-at-will is a long standing rule in this State which recognizes the concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong. ***Harney v. Meadowbrook Nursing Center***, 784 S.W.2d 921, 922 (Tenn.1990); ***Watson v. Cleveland Chair Co.***, 789 S.W.2d 538 (Tenn.1989). Both by statute and case law in this and other states, however, some restrictions have been imposed upon the right of an employer to terminate an at-will employee. In Tennessee an employee-at-will generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision. ***See e.g., Mason v. Seaton***, 942 S.W.2d 470 (Tenn.1997); ***Conatser v. Clarksville Coca-Cola***, 920 S.W.2d 646 (Tenn.1995); ***Reynolds v. Ozark Motor Lines, Inc.***, 887 S.W.2d 822 (Tenn.1994); ***Anderson v. Standard Register Co.***, 857 S.W.2d 555 (Tenn.1993); ***Hodges v. S.C.***

-10-

***Toof & Co.***, 833 S.W.2d 896 (Tenn.1992); ***Chism v. Mid-South Milling Co.***, 762 S.W.2d 552 (Tenn.1988); ***Clanton v. Cain-Sloan Co.***, 677 S.W.2d 441 (Tenn.1984).

***Id***. at 716-17.

In the instant case, Ms. Dodson has not alleged that her termination was in violation of any statute, right, or public policy. The gravamen of at-will employment is the recognition that both employers and employees need freedom to make their own business judgments without interference of the courts. ***Mason v. Seaton***, 942 S.W.2d 470, 474 (Tenn. 1997). Absent a clear abuse of law or policy, it is beyond the purview of this Court to find that an employer is guilty of "a legal wrong" in terminating an employee who is believed to have participated in the stalking and harassment of another employee. However, although no "legal wrong" arises from the actual termination of an at-will employee in Tennessee absent violation of policy or statute, we cannot stretch the holding of ***Stein*** so far as to say that there can be no cause of action arising from the **manner** in which an at-will employee is terminated. Consequently, we will address the merits of Ms. Dodson's causes of action for both intentional and negligent infliction of emotional distress.[2]

Our Supreme Court outlined the three elements that a plaintiff must allege to make a prima facie showing of intentional infliction of emotional distress in ***Bain v. Wells***, 936 S.W.2d 618 (Tenn.1997). "[U]nder Tennessee law, there are three essential elements to a cause of action: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." ***Id***. at 622. As to the second element, Tennessee has adopted the definition of outrageous conduct given in the Restatement (Second) of Torts:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

---

[2] We note that Ms. Dodson's second issue only raises a question concerning the negligent infliction of emotional distress claim; however, we will address both negligent and intentional infliction of emotional distress since both were raised in the Complaint.

*Id*. at 623.

The recitation of the undisputed material facts in this case, as set out above, simply does not arouse the level of resentment toward the Hospital or its employees that would be necessary to make out a claim for intentional infliction of emotional distress.

As to the claim for negligent infliction of emotional distress, our Supreme Court has outlined the prima facie case for negligent infliction of emotional distress. In order to make such a case, the plaintiff must prove the elements of duty, breach of duty, injury or loss, causation in fact, and proximate cause. *See Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn.1996). In *Camper*, the Court further held that recovery for negligent infliction of emotional distress claims, where there is no physical injury, is limited to serious or severe emotional injury supported by expert medical or scientific proof. *Id*. From our review of the record, Ms. Dodson has provided no scientific or medical proof to meet the burden of establishing an injury under this tort. Consequently, summary judgment was correct on these causes of action.

Appellees seek an award of attorney fees and costs for a frivolous appeal. As our Supreme Court has stated, "Successful litigants should not have to bear the expense and vexation of groundless appeals." *Davis v. Gulf Insurance Group*, 546 S.W.2d 583, 586 (Tenn.1977). However, from the totality of the circumstance, we do not find this to be a frivolous appeal. For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the Appellant, Judy Dodson, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.